**STATE, Plaintiff-Appellee, v. COSBY, Defendant-Appellant.**

Ohio Appeals, Eighth District, Cuyahoga County.

No. 24845. Decided October 30, 1959.

John T. Corrigan, Pros. Atty., Merle M. McCurdy, Reuben M. Payne, Asst. Pros. Attys., for plaintiff-appellee.

Robert B. Krupansky, Theodore Williams, for defendant-appellant.

## OPINION

By SKEEL, J:

This appeal comes to this court on questions of law from the Court

of Common Pleas of Cuyahoga County. The judgment of the trial court was entered on the decision of three judges of guilty of murder in the first degree. The judges did not recommend mercy.

Raymond George Mack, a shoe salesman for the Thom McAn's Shoe Store, located at 10417 St. Clair Avenue, was shot and killed at about two-thirty in the afternoon of October 10, 1958. There is no controversy but that the death was occasioned by the discharge of a revolver then held in the hand of the defendant. There is likewise no controversy but that the wrist watch of the deceased and certain money belonging to the shoe company was carried out of the store in a green paper bag by the defendant. It is the claim of the State that the defendant purposely caused the death of the deceased in the perpetration of a robbery. It is the claim of the defendant that he came into the store (with the revolver in his possession) when, after he entered, he discovered what he thought was a robbery in progress. That he believed that the robbery was taking place in a rear room of the store. That he, the defendant, upon entering and seeing there was no one in the store, twice announced "boisterously" "was there anybody here" when a voice in the rear room said "get out of here man, go ahead get out." That he then cautiously. with his revolver drawn and "cocked," proceeded to the back room and as he was in the entrance to the rear room. a man rushed by him, wedging him "in against the back of the partition and the gun discharged." The defendant claims that after the gun went off, a second man went by him and ran out of the store.

From the judgment of guilty of first degree murder without a recommendation of mercy, the defendant claims the following errors:

"1. The State failed to properly preserve and present material evidence within its control that would have conclusively vindicated the Appellant.

"A. Said act constituted misconduct of the prosecutor.

"B. Said acts were prejudicial to Appellant and deprived him of due process of law contrary to the 14th Amendment of the Constitution of the United States and the Constitution of Ohio.

"2. The Court erred in admitting the confession of the Appellant, Joseph Louis Cosby, in the absence of some extrinsic evidence of corpus delecti.

"3. The verdict of the Court is contrary to the manifest weight of the evidence.

"A. The Court erred in finding a robbery was attempted or committed by the Appellant.

"B. The Court erred in finding the Appellant guilty of murder in the first degree for unlawfully and purposely killing while perpetrating a robbery.

"4. The Court erred in overruling Appellant's motion for a new trial."

The defendant in his statements and testimony, which are in serious conflict on some material circumstances, stated, in part, to the effect that he went into the Thom McAn Shoe Store in the early afternoon of October 10, 1958, to buy a pair of shoes. He was waited on by Raymond George Mack. The defendant bought a pair of shoes, paid a

dollar down, which was marked on the shoe box, a receipt being given by Mack, and the box placed in the back room on "Will Call." He then testified that he went to another store, and tried to purchase a jacket. Not finding one to his satisfaction, he said he returned to the shoe store to pay another dollar on the shoes. He had two dollars and thirty-five cents on his person when he deposited the first dollar. The store seemed empty when he entered the second time. He called out in a loud voice, as above quoted, when a reply came from the back room "get out of here man, go ahead, get out." He claims to have recognized the voice as that of Elijah Howard. He testified that he drew his gun which was loaded, cocked it and started to the back room cautiously, with his back pressed against the partition as he entered the doorway where he held his revolver in front of him. Edging around the first corner and as he was about to pass the second corner to reach the back room, a tall man in army fatigue jacket (identified as Elijah Howard) ran past him, hitting his right arm in such a way as to discharge the gun. A short, stocky man, later claimed to be the "Cocaine Kid" (Harold Morton) immediately followed and both ran out the front door.

The defendant's testimony as to what took place when the shooting occurred was as follows:

"Q. Where was the gun at this particular time, in which hand did you have the gun?

"A. In my right hand.

"Q. How were you holding it?

"A. In front of me.

"Q. Would you tell us what happened when the man brushed past you?

"A. When this man rushed past me, it wedged me up against the back of the partition, and the gun discharged.

"Q. Where did he bump you or jostle you?

"A. Right on the side of my right arm.

"Q. You stated that the gun discharged?

"A. Yes, sir.

"Q. And then what happened, sir?

"A. Then, sir, there was a chain reaction. After the first man—

"* * *

"A.—the gun discharged and I heard someone falling, and the second man ran past me at the same time.

"Q. How long did that take, how much of a time interval elapsed from the time that you stepped around the corner and the man brushed you, the gun went off and you heard this man fall?

"A. Sir, I couldn't exactly bring it down to minutes.

"Q. Was it seconds?

"A. It was seconds.

"Q. Then what did you do, sir?

"A. After I gathered my balance again, I stepped fully into the back of the store.

"THE COURT: You stepped what?

"THE WITNESS: Fully into the back of the store.

"Q. Were you frightened at that time?

"A. Not then, no, sir.

"Q. Tell us what happened?

"A. Upon stepping fully into the back of the store, I saw the body of this man, white, lying up next to the door, I believe, and that's when I got a little shaky, and I sat down.

"Q. Were you confused at that time?

"A. More or less, yes, sir.

"Q. By the way, were you still on parole at this time?

"A. I was.

"Q. What further observations did you make?

"A. While sitting there I saw a green bag.

"Q. Where was this green bag?

"A. Lying approximately a foot and a half from the man, it was immediately to my left. I was facing him.

"Q. What did you do?

"A. After sitting there for a few minutes I picked the bag up.

"Q. Then what did you do?

"A. I left the store."

On the way home, he changed some of the change (there being some rolls of quarters in the bag) into bills, made some purchases of clothing and later purchased a pair of shoes and three skirts for his girlfriend, using the money taken from the bag.

When first arrested, in attempting to explain his possession of the watch and money, the defendant stated that he saw a tall colored man cross St. Clair Avenue, later identified at Elijah Howard, and that he, Howard, put a paper bag by the steps of a church and that he, the defendant, after Howard left, then retrieved the bag in which was the watch and money. The defendant told a wholly different story on the stand as above quoted, also, he is alleged to have told a police officer that he got the gun that was discharged in the killing of Mack from a pawn shop but when confronted by the pawn broker, he then and in his signed statement, said he "lifted it from a drunken passenger on a C. T. S. bus." There is no contradiction of the evidence that the proprietor of a lunch room on Lexington Avenue was robbed October 4, 1958, at about 10:30 P. M. The owner, Henderson, testified he was "beaten up" by the robber who took, among other things, a German made revolver he then had in his pocket. This witness had the box in which the revolver was sent to him from a Chicago Department Store upon which was printed the same serial number that was on the gun that was discharged while in defendant's possession killing Mack. The box is in evidence, as is also the remains of the gun. (The defendant testified that on the evening of October 10th, he dismantled the revolver, scattering parts of it along Bryant Avenue, and threw the barrel on top of the roof of a gas station. It was recovered from the roof by the police.) This witness identified Cosby in a police lineup, after he (Cosby) has been arrested for the murder of Mack, as the man who robbed him. The defendant was on parole from a conviction of robbery in which he admitted having inflicted violence on the victim. The court must have considered these robberies under the provisions of §2945.59 R. C.

In considering defendant's claims of error, we find that the record does not support the defendant's claim that the State withheld evidence that would have been helpful to the defendant. The claim is based on the supposition that one, Alice Hall, was taken into custody and after questioning, was released, to prevent the defendant from having the benefit of her testimony. She could not thereafter be found. One of the police officers testified that Alice Hall told him that Elijah Howard told her that he was in the Thom McAn's Shoe Store at the time Cosby was there. The court struck this evidence from the record as hearsay. This ruling was correct. We find no evidence in the record to sustain the defendant's claim of withholding evidence within the possession of the State that might have been beneficial to the defendant. The defendant's first claim of error is overruled.

The second claim of error is that the defendant's statements to the police officers while in custody were erroneously received into the evidence before the fact that the deceased's death was the result of a criminal act was, at least, in part, established by independent evidence. In other words, the claim is that the corpus delicti was not established before the defendant's statements to the police before indictment were received into evidence upon trial on the merits.

It is not essential in establishing what is designated as the corpus delicti in the criminal law, as a prerequisite to the introduction of a statement made to the police by one charged with crime, that all the elements of the crime be supported by evidence other than that contained in the statement. It is enough that some independent evidence is presented tending to show that a crime has been committed, as for example, in a homicide case, to show the existence of a dead body where death was caused by criminal means. In **State v. Maranda, 94 Oh St 364,** 114 N. E. 1033, the court said:

"1. By the **corpus delicti** of a crime is meant the body or substance of the crime, included in which are usually two elements: 1) The act. 2) The criminal agency of the act.

"2. It has long been established as a general rule in Ohio that there must be some evidence outside of a confession, tending to establish the **corpus delicti,** before such confession is admissible. The **quantum** or weight of such outside or extraneous evidence is not of itself to be equal to proof beyond a reasonable doubt, nor even enough to make it a prima facie case. It is sufficient if there is **some** evidence outside of the confession that tends to prove **some** material element of the crime charged."

A correct definition of the meaning of "Corpus Delicti" is set out in Ballentine's Dictionary, page 294, as follows:

"The body of the crime, meaning that the specific crime charged has actually been committed by someone. It is made up of two elements: first, that a certain result has been produced, as that a man has died or a building has been burned; second, that someone is criminally responsible for the result."

The elements necessary to make out the corpus delicti (the body of the crime) defined in the Maranda case, supra, are directly based on the

rule as stated in Wharton's Criminal Evidence, page 635, para. 325, Tenth Edition, 1912, where it is said:

"The finding of a dead body establishes only the corpus. The finding of such body under circumstances that indicate a crime would indicate the delicti or felonious killing.

"When these facts concur, the first element of the corpus delicti, the criminal act, is made to appear. Hence, it is not necessary to the establishment of a complete corpus delicti that identity should be shown, because the dead body and the crime against it complete all that is indicated by the corpus delicti."

And on page 1312, para. 633, the author says:

"The term corpus delicti is so invariably associated with homicide only, that its existence as a part of the proof of every crime is frequently ignored. Hence, in dealing with corroboration of confessions, courts use a rather loose phrasing, such as, 'there should be some proof that a crime has been committed,' or 'there should be some circumstance corroborating or fortifying the confession, which phrases indicate that the corpus delicti, 'the body of the crime,' 'the proof of the crime' or however else it may be expressed, must be shown by evidence independent of the confession. That this is an essential is found in the statement of the general rule, that, to warrant a conviction upon an extrajudicial confession of the accused, there must be independent evidence to establish the corpus delicti of the crime, and the rule is also expressed in many statutory enactments."

Historically the rule came into being because of erroneous results coming about because of extrajudicial confessions used as the primary basis for a judgment of guilty in homicide cases. Many times such confessions were induced by fear of the multitude, sometimes by a sense of grandeur, the desire to attract attention and the like. In Wigmore on Evidence, Vol. VII, Third Ed., 1940, para. 2081, the author says:

"The attempt has often been made to establish a rule that, for proving the 'corpus delicti'—the fact of death, on a charge of homicide, or of abstraction of goods, on a charge of larceny—there must be direct or testimonial evidence, i. e. a witness who has seen the lifeless body of the person, or the vacant place where the goods were."

And footnote 4 sets out Perry's Case, 14 How. St. Tr. 1312 (murder), where the supposed murdered man whose body was not found, returned home two years after the accused's execution. Presumably the conviction was the result of a confession with other evidence. Also, in the trial of Stephen and Jesse Boorn for the death of Russell Colvin, reported in 6 American State Trials, page 73 (1819) Vermont, where, after pressure from the multitude, the defendants were indicted and tried some five years after the supposed death of Colvin. The case was tried and a judgment of guilty was entered on circumstantial evidence and confessions of the defendants. Before the sentences of death were executed, the supposed deceased was returned to the jurisdiction of the court trying the case whereupon the defendants were discharged. This case, with others, is set out in f. n. 4 page 418 of Vol. VII of Wigmore, supra, to demonstrate the basis for requiring proof of death by criminal means

in a homicide case before an extra-judicial confession may be depended on.

The requirements of the rule of corpus delicti in a homicide case do not require more than some evidence to support the fact that a human being has come to his death by criminal means.

The record in this case goes far beyond the requirements, as thus defined as a prerequisite for the admission of the defendant's conflicting extrajudicial confessions. There is no dispute but that Raymond George Mack came to his death as the direct result of a gunshot wound. This certainly would tend to show death as the result of a criminal act. His body was also bruised as if he had been the subject of violence beyond that of the wound resulting from a bullet discharged from a revolver. The (dead) body of the deceased was found in the back room of a shoe store where he was employed and where it was shown money used in the operation of the business in excess of one hundred fifty dollars was missing. This and other evidence in the record shows that the corpus delicti was clearly established as a prerequisite to presenting the defendant's statements to the police. We, therefore, dismiss the defendant's second claim of error.

The third and fourth claims of error that the judgment is against the "manifest" weight of the evidence and that it constituted prejudicial error to overrule defendant's motion for new trial are likewise overruled. A careful reading of the record discloses an abundance of evidence to support the judgment. The defendant admits being in possession and holding the gun at the time the bullet was discharged (claimed to have been accidentally done because of Howard and Morton) and which caused the death of Mack. The defendant was at this time a parolee from the reformatory, having been sentenced for robbery in which the police records show he admitted administering cruel violence on his victim. The defendant was identified as the perpetrator of another robbery in which violence was used and in which the revolver which caused Mack's death was stolen. The defendant used the money which he carried from the shoe store in a paper bag. His conflicting statements about how he got possession of the money and the revolver were highly detrimental to the credit the court could give to his testimony. His reason for going back to the shoe store after depositing one dollar for the purchase of a pair of shoes was at least unusual. It would likewise be unusual, if Howard and Morton were there robbing Mack (at the time Cosby entered the shoe store), that when someone entered the store out of their view, they would continue with their unlawful purposes and simply yell out to someone unknown "get out of here man, go ahead, get out." These are but a few of the reasons why the court was clearly justified in giving little credit to the defendant's claim that the gun was discharged accidentally by Howard brushing by him in attempting to get out of the back room at the time of the shooting. The court could, upon solid ground, have concluded, as it must have done, that the defendant's story that Howard and Morton were in the store when Mack was killed was not worthy of belief.

We find from a careful reading of the record that the defendant's

56

claims of error are not well taken and that substantial justice has been done.

Judgment affirmed.

HURD, PJ, KOVACHY, J, concur.